**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

iC-1 SOLUTIONS, LLC
12100 Sunset Hills Rd.
Suite 310
Reston, VA 20190,

TLG WORLDWIDE, LLC
12100 Sunset Hills Rd.
Suite 310
Reston, VA 20190,

       Plaintiffs,

v.                                                            Case No. 1:25-cv-00079

RAPTORS EDGE SOLUTIONS LLC
9315 Center St.
Suite 204
Manassas, VA 20110,

    SERVE: Corporation Service Company
         100 Shockoe Slip
         Floor 1
         Richmond, VA 23219,

BRYCE WILKINS,

ANDREW FERNANDES,

and

Defendants DOES 1-10,

       Defendants.

## COMPLAINT

Plaintiffs iC-1 Solutions, LLC ("iC-1") and TLG Worldwide, LLC ("TLG"), by counsel,

file this Complaint against Defendants Raptors Edge Solutions LLC ("Raptors Edge"), Bryce

Wilkins ("Wilkins"), Andrew Fernandes ("Fernandes"), and Defendants Does 1–10 (collectively, "Defendants") and allege the following:

## INTRODUCTION

1.      This case arises out of a brazen and calculated scheme by former employees who have not only conspired to steal trade secrets and customers of Plaintiffs, but who have also sought to entice a prime contractor working with Plaintiffs on a government contract to assist Defendants' reprehensible efforts to "set various triggers [on Plaintiffs' government deliverables] to have them start failing."  The Defendants must be stopped.

2.      Plaintiffs iC-1 and TLG are technology companies operating in the civilian, defense, and intelligence community markets and are wholly-owned subsidiaries of The Swift Group Holdings, LLC ("Swift").  Defendants Fernandes and Wilkins are both former employees of iC-1.

3.      While still employees of iC-1, Wilkins and Fernandes in concert with Defendants Does 1–10 devised to form and/or use Raptors Edge to compete with Plaintiffs through unlawful use of Plaintiffs' software platform ("Serpent" or the "Platform") and Plaintiffs' other confidential and proprietary information and trade secrets such as, configurations and other data relating to Serpent, methods of operation, customer lists and data, customer communications, any source code and development of products and services, product and services information, marketing plans and strategies, cost and pricing materials, training materials, draft and final proposals, contracts, contract negotiations, financial information and projections, recruiting and staffing materials, personnel data, management information systems, utilization procedures and protocols, utilization review and quality assurance mechanisms and data, and any other communications and documents that Plaintiffs maintain as confidential (collectively, "Protected Information").

4.      Defendants appear to have acted in concert on a plan to steal the intellectual property underlying Serpent to create a competing product derivative of Serpent that they are now secretly marketing directly to the customers of both iC-1 and TLG, including through Raptors Edge.

5.      Plaintiffs have recently discovered that, at the time Fernandes was leaving iC-1, Wilkins shared with Fernandes voluminous client records of Plaintiffs, including financial records and every training exercise for every client.

6.      In the weeks after leaving iC-1, Fernandes improperly and excessively accessed the Protected Information on Plaintiffs' computer system, specifically the intellectual property underlying Serpent.

7.      Then, as he was leaving iC-1, Wilkins instructed Plaintiffs' IT to restrict Plaintiffs' employees' access to files and then maliciously ordered the deletion of the documents needed to run Plaintiffs' training business while claiming he was keeping those files safe, presumably with an intent to destroy Plaintiffs' businesses.

8.      Further, after both of the individual Defendants departed from iC-1, Wilkins and Fernandes shockingly plotted in writing to disable iC-1's Serpent deliverable on a government contract to undermine iC-1's reputation, goodwill, and ability to win future business from iC-1's primary customer.

9.      Ultimately, the Defendants' clandestine scheme involved Wilkins contacting iC-1's customer, Core One Solutions LLC ("Core One"), to enlist Core One's participation in the scheme as they unlawfully sought to trigger a failure in Plaintiffs' deliverables to the government under a government contract.

10.     To this day, Defendants, on behalf of themselves and Raptors Edge, continue

conspiring with iC-1's former employees to interfere with Plaintiffs' current and future business opportunities.  Plaintiffs are concerned about the imminent threat posed by Defendants, as well as the irreparable harm that may result at any time to Serpent and other assets of Plaintiffs, including their Protected Information, their customers, as well as Plaintiffs' competitive position and future financial success.

11.    Defendants' continuing misconduct violates federal and Virginia statutory law and common law.  To stop Defendants from further harming their businesses, Plaintiffs now seek preliminary and permanent injunctive relief and all other relief the Court deems proper.

## PARTIES

12.    Plaintiff iC-1 Solutions, LLC is a Virginia limited liability company with its principal place of business at 12100 Sunset Hills Rd., Suite 310, Reston, VA, 20190 and is a wholly-owned subsidiary of Swift.

13.    Plaintiff TLG Worldwide, LLC is a Delaware limited liability company with its principal place of business at 12100 Sunset Hills Rd., Suite 310, Reston, VA, 20190 and is a wholly-owned subsidiary of Swift.  TLG is authorized to do business as a foreign entity in the Commonwealth of Virginia.

14.    Defendant Raptors Edge is a Delaware limited liability company with its principal place of business at 9315 Center St., Suite 204, Manassas, VA, 20110.

15.    Upon information and belief, Defendant Wilkins is a resident of Virginia and is currently employed by Defendant Raptors Edge.

16.    Upon information and belief, Defendant Fernandes is a resident of Virginia and is currently employed by Defendant Raptors Edge.

17.    Upon information and belief, Defendants Does 1–10 are presently unknown persons and/or entities acting in concert and participation with Defendants Wilkins, Fernandes,

and Raptors Edge.

## JURISDICTION AND VENUE

18.     This action arises out of Defendants' violations of the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836; the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*; the federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*; the Virginia Computer Crimes Act, Va. Code §§ 18.2-152.4, 152.12; Virginia Statutory Business Conspiracy, Va. Code §§ 18.2-499-500; the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-337–38; and related claims under the common law of Virginia.

19.     This Court has original jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a), and the doctrines of ancillary and pendent jurisdiction.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of Defendants' wrongful acts or omissions occurred in the district and upon information and belief Defendants Fernandes and Wilkins are residents of this district and Defendant Raptors Edge is a Delaware limited liability company with its principal place of business in this district.

## FACTUAL ALLEGATIONS

### A.     iC-1 and TLG's Business

21.     Plaintiffs are companies that provide information technology capabilities (including, but not limited to, enterprise IT, cyber solutions, cloud computing, and data science), third-party logistics, and nontraditional operations for the intelligence community (activities, missions, or methodologies that deviate from conventional intelligence practices or frameworks which are often designed to address emerging threats, adapt to new technological landscapes, or operate in unconventional environments).

22.     In performing their work, Plaintiffs, as affiliate entities, share Protected

5

Information with each other.

23.     Plaintiffs also leverage their strong ties to the intelligence community to win government contracts and subcontracts from the Department of Defense to develop cutting-edge software used in intelligence operations and to train military personnel on non-traditional military operations.

24.     Plaintiffs' customers also include other entities in the intelligence community and private companies that have need of their specialized products.

25.     Plaintiffs take strong measures to secure their Protected Information both to maintain competitive advantage in the market and to prevent disclosure of the highly sensitive information in their possession.  These measures include but are not limited to: (a) password protecting files; (b) limiting access to information to employees on a need-to-know basis; (c) requiring employees to sign agreements mandating confidentiality, non-solicitation, and non-competition; (d) locking equipment in a controlled access storage room; and (e) monitoring with video surveillance.

26.     In addition, Plaintiffs have instituted workplace policies to further secure their Protected Information by communicating clear rules and protocols to their employees.  These policies include the Confidential Information and Intellectual Property, Information Sensitivity, and Acceptable Use of Technology Policies in Swift's Employee Policy and Procedure Manual (the "Handbook"), which applies to Plaintiffs' employees.

27.     By way of example, under the Confidential Information and Intellectual Property policy employees are required, *inter alia*, "to retain information relating to [Plaintiffs] in the strictest of confidence with information shared only on a business need-to-know basis" and told that "[i]t is a prime responsibility of all employees and contractors to use such information only in

the performance of duties."

28.     The Confidential Information and Intellectual Property policy also dictates that "[n]o employee should, during or after his/her employment with [Plaintiffs], use any confidential information for his/her benefit, or disclose to any person, business, or corporation any confidential information without prior written consent of [Plaintiffs]" and that "[e]very employee shall avoid discussing any matter of a confidential nature, or which constitutes confidential information, with any competitor or its employees . . . ."

29.     The Handbook also requires that employees return any confidential information or other property of Plaintiffs to iC-1/TLG at the end of employment.

30.     As defined in the Handbook, confidential information includes:

(a) The names of [Plaintiffs'] customers and the nature of the relationship between the companies.

(b) Techniques, developments, improvements, inventions, and processes that are, or may be, produced in the course of [Plaintiffs'] operations.

(c) Trade secrets.

(d) Any other information not generally known concerning [Plaintiffs] or [their] operations, products, suppliers, markets, sales, costs, profits, customer needs and/or other information acquired, disclosed, or made known to employees, vendors, or contractors, which, if used or disclosed, could adversely affect [Plaintiffs'] business or give competitors an advantage.

31.     As an additional example, the Handbook contains an Information Sensitivity Policy that divides confidential information into categories of sensitivity that require increasing levels of protection.  The information designated "most sensitive" includes "[t]rade secrets and marketing, operational, personnel, financial, source code, and technical information integral to the success of [Plaintiffs]" that is to be shared only with specifically approved employees and non-employees bound by signed non-disclosure agreements.

**B.      Wilkins and Fernandes's Employment at iC-1**

32.      On or about September 10, 2018, iC-1 hired Defendant Fernandes as a Senior Cyber Software Engineer for its Mobile Team.

33.      As part of his onboarding process, Fernandes signed an employment agreement (the "Employment Agreement") on September 10, 2018.   The Employment Agreement includes conflict of interest, confidentiality, use of technology and return of property, non-solicitation, and non-compete provisions.

34.      In Section 1(e) of the Employment Agreement, it states that Fernandes "must never allow [himself] to be placed in a position where [his] personal interests are in conflict (or could be in conflict) with the interests or business of [iC-1]" and that he "must avoid any situation or activity that compromises, or may compromise, [his] judgment or ability to act in the best interest of [iC-1]."

35.      While an employee, the Employment Agreement required Fernandes to devote his "full time and attention to the business and the affairs of IC-1."  If Fernandes wanted to engage in outside employment, he was required to disclose the outside employment to iC-1 and obtain written approval.  The Employment Agreement specifies that "[a]pproval will only be withheld if [iC-1] reasonably determines that the employee's proposed outside employment or business activity could conflict or compete with the interests of the company or could negatively affect the employee's job performance or attendance."

36.      Section 5(c) of the Employment Agreement details Fernandes's confidentiality obligations to iC-1.  Specifically, Fernandes was obligated during his employment to "hold in strictest confidence, and not use, except for the benefit of [iC-1], or to disclose to any person, firm, or corporation without the prior written authorization of CEO of [iC-1], any of [iC-1's] Confidential Information."  Confidential Information is defined under Section 5(a) as follows:

[I]nformation relating to [iC-1] or its current or proposed business, financial statements, budgets and projections, customer identifying information, potential and intended customers, employers, products, computer programs, specifications, manuals, software, analyses, strategies, marketing plans, business plans, and other confidential information, provided orally, in writing, by drawings, or by any other media. [Fernandes] will treat the Confidential Information as confidential and will not disclose it to any third party or use it for any purpose but to fulfill [his] obligations in this agreement. In addition, [Fernandes] shall use due care and diligence to prevent the unauthorized use or disclosure of that information.

37.    Section 6 of the Employment Agreement establishes that "IC-1 owns the rights to all data and files in any computer, network, and all data and files sent or received using any [iC-1] system or using [iC-1's] access to any computer network" and that "[a]ny misuse of [iC-1] or government information systems may be ground for disciplinary actions or immediate termination."

38.    Section 6 also dictates that Fernandes return to iC-1 all "products, samples, models, property, and documents relating to [iC-1's] business including reports, abstracts, lists, correspondence, information, computer files, computer disks, and other materials and copies of those materials obtained by [Fernandes] during and in connection" with his work for iC-1 within three days of the termination of his employment and that "[a]ll files, records, documents, blueprints, specifications, information, letters, notes, media lists, original artwork or creative work, notebooks, and similar items relating to [iC-1's] business, whether prepared by [Fernandes] or by others, remain [iC-1's] exclusive property."

39.    Section 8 of the Employment Agreement prohibits Fernandes from soliciting clients, customers, and employees of iC-1.  Specifically, Fernandes may not do the following for one year after termination of his employment with iC-1:

(a) canvass or solicit the business of (or procure or assist in the canvassing or soliciting of) any client, customer, or employee of [iC-1] who is known to [Fernandes] because of their association with [iC-1] during the Employment Period for the purposes of competing with [iC-1]; (b) accept (or procure the acceptance of) business from a client, customer, or employee of [iC-1] known to [Fernandes]

because of their association with [iC-1] during the Employment Period for purposes of competing with [iC-1], regardless of who initiated first contact (employee, client or customer). (c) otherwise contact, approach, or solicit (or procure the contacting, approaching, or soliciting of) an entity known to [Fernandes] because of their association with [iC-1] before the Effective Date in a way that could be detrimental to [iC-1].

40.     Section 9 of the Employment Agreement prohibits Fernandes from competing with iC-1 for 1 year following the termination of his employment.  The Employment Agreement states that Fernandes "may not engage, own, manage, control, operate, be employed by, participate in, or be connected with the ownership, management, operation, or control of a business that participates in direct-competition, on the same programs [as iC-1] for a period of 1 year."

41.     If Fernandes either breaches or threatens to breach the non-compete obligations in Section 9 of the Employment Agreement, iC-1 is "entitled to a preliminary restraining order and injunction preventing [Fernandes] from violating its provisions."

42.     Finally, the Employment Agreement includes a mutual indemnification provision in Section 10 obligating Fernandes as follows:

> **(a) Of Company by Employee.** At all times after the effective date of this agreement, [Fernandes] shall indemnify [iC-1] and its officers, members, managers, employees, owners, (collectively, the "**Company Indemnitees**") from all damages, liabilities, expenses, claims, or judgments (including interest, penalties, reasonable attorneys' fees, accounting fees, and expert witness fees) (collectively, the "**Claims**") that any Company Indemnitee may incur and that arise from: (i) [Fernandes's] negligence or willful misconduct arising from [Fernandes's] carrying out of [his] obligations under this agreement; or (ii) [Fernandes's] breach of any of obligations or representations under this agreement.

43.     On or about June 7, 2021, iC-1 hired Wilkins as the Director of Non-Traditional Training Programs.

44.     As employees of iC-1, Wilkins and Fernandes acknowledged receiving copies of the Handbook.  Specifically, on or about June 2, 2023, both Defendants signed an acknowledgement that they had downloaded and read the most up to date version of the Handbook,

including the policies discussed above.

## C.     The Development of Proprietary Software Called "Serpent"

45.     Serpent is a Ubiquitous Technical Surveillance ("UTS") software platform that collects, correlates, and analyzes an operator's digital signature.  It enables the operator to analyze cellphone activity and inactivity to assess digital patterns and anomalies to mitigate operational risk.

46.     Commencing in or around the fall of 2021, iC-1 paid Defendants Wilkins and Fernandes to design, create, and market Serpent.

47.     Fernandes, as iC-1's Director and Lead Architect and Developer for Serpent, oversaw all the source coding for the Platform.

48.     As an employee of iC-1, Wilkins was responsible for sales and developing requirements for the user interface of Serpent by working with the coding team to refine the Platform's capabilities.

49.     iC-1 later tasked Wilkins with gaining customers for Serpent.  In that role, Wilkins interfaced with iC-1's customers on a regular basis and served as their primary point of contact on behalf of iC-1.  Later, when TLG entered into contracts with customers for training on Serpent, Wilkins served as the point of contact for those customers and interfaced with them on a daily basis.

50.     During and after the development of Serpent, iC-1 entrusted Fernandes and Wilkins with significant amounts of Protected Information related to Serpent and other of Plaintiffs' products and customers.

51.     Other iC-1 employees who worked on Serpent included software developers Dan Schneider ("Schneider") and John Hargenrader ("Hargenrader"), the Director of Talent Management Growth & Intelligence Operations Evan Di Silvio ("Di Silvio"), and the Training

Division's Operations and Logistics Support Specialist Catherine "Cat" Kennedy ("Kennedy"). Additionally, TLG employee John "Jay" Wright ("Wright") served as the Executive Coordinator on the Serpent project.  Software developers Yani Gomez ("Gomez"), and Nick Privalov ("Privalov") later joined the Serpent team after initial development of the Platform was complete.

52.     Between labor and other research and development costs, Plaintiffs expended nearly $2,000,000.00 designing, creating, and marketing Serpent in approximately one year.

53.     Development of Serpent was completed in/around late 2022, although Plaintiffs continue to further develop and refine Serpent to meet their customers' needs to this day.

54.     Plaintiffs diligently took, and continue to take, the following steps to protect their trade secret, Serpent: (1) storing its source code and configurations on password-protected servers separate from other data; (2) limiting access to these servers to employees on a "need to know basis"; (3) avoiding including information about Serpent on company websites; and (4) instituting strong confidentiality policies supported in many cases by agreements with confidentiality, non-solicitation, and non-competition obligations.

55.     Plaintiffs have contracted with clients, including the ██████████████, ██████, and intelligence community entities, to provide services and training on Serpent.

56.     In contracts with customers, Plaintiffs include language to protect their intellectual property rights to Serpent.  For example, iC-1's current contract with Core One (discussed below) mandates that the contract shall not be "construed as granting to any party (including the Customer, the Parties to this Agreement, the Government or any third party) a license, express or implied, under any patent, copyright, trade secret, or other intellectual property right now or hereafter owned, obtained, or licensable by a Party to this Agreement."

**D.     iC-1 becomes Core One's Subcontractor on the ██████ Contract**

57.     Core One provides high-end operational, training, and technical solutions to

support the U.S. national security community.

58.     Plaintiffs partner with Core One on federal government contracts.

59.     In or about May 2019, Core One was awarded an Indefinite Delivery/Indefinite Quantity Training Contract ("████ Contract") with the ████████████████████ ("██████").

60.     After ██████ awarded Core One the ██████ Contract, Core One engaged iC-1 as a subcontractor through a succession of purchase orders.

61.     iC-1's duties under the purchase orders include training military personnel on using Serpent loaded onto iC-1-issued cell phones ("Training Phones").

62.     An individual with a Training Phone can use Serpent but does not have access to Serpent's underlying Protected Information, akin to a civilian's use of an application downloaded onto a cell phone.

63.     Prior to any training of military personnel, iC-1 must set up the Training Phones and configure, test, and deliver the devices to the military personnel.

64.     After the completion of a training exercise, the Training Phones are "flashed," which cleans out old data so that the phone can be reused for the next training exercise.

65.     The first purchase order was issued in January of 2023.  The current operative purchase order ("Purchase Order 0000072") was effective June 7, 2024 and obligates iC-1 to provide trainings to ██████ through May of 2025.

66.     iC-1's work under the purchase orders has been well reviewed by both Core One and ██████.

67.     The purchase orders between iC-1 and Core One along with additional contracts for training and services on Serpent have generated substantial revenue for Plaintiffs to date.

E.      **Serpent's Lucrative Future**

68.     Serpent is a unique product in the market and for this reason Plaintiffs anticipate that Serpent will continue to be a success on existing and new contracts for clients and future clients.

69.     Wilkins and Fernandes were well aware of the success of Serpent and the Platform's potential for significant future revenue.  Wilkins was responsible for presenting monthly about Serpent's financials across Swift and all its wholly-owned subsidiaries (collectively, "Swift Entities"), including revenue, profit, and future sales and revenue projections.

70.     For example, the ███████ Contract is set to be  awarded in the spring of 2025 for a five-year term.  Proposals to the solicitation are due mid-February 2025.

71.     Wilkins informed Swift CEO Holton Yost ("Yost") in or around February of 2024 that Fernandes was demanding higher compensation based on Serpent's profit and was threatening to leave iC-1 if he did not receive equity.  Wilkins relayed to Yost that Fernandes wanted to start his own company and asked Wilkins to join him at the new entity.  Upon information and belief, Wilkins was also unhappy with his own compensation.

72.     Yost believed that Wilkins and Fernandes were appropriately compensated.  Still, in recognition of Wilkins and Fernandes's work on Serpent for iC-1, Swift gave them both the right to earn Swift stock in June of 2024 as Serpent's sales increased.

73.     Then, Fernandes complained to Yost that he wanted his shares in Swift to vest faster.

F.      **Wilkins and Fernandes Conspire to Form Raptors Edge**

74.     Upon information and belief, in the spring of 2024, Wilkins and Fernandes schemed with Defendants Does 1–10 to form Raptors Edge.  It appears that the goal of the conspiracy was to steal Serpent and other Protected Information, use the information to create a competitor to

14

Serpent, and sell the competitive product derivative of Serpent to Plaintiffs' customers through Raptors Edge.

75.     Wilkins and Fernandes were motivated by greed, believing that they were owed more compensation due to Serpent's success and so devised to steal the Platform from their employer.

76.     During the summer and fall of 2024, Wilkins and Fernandes, without disclosure to Plaintiffs, acted quickly to establish Raptors Edge, steal Protected Information, depart iC-1, and pursue Plaintiffs' customers and business opportunities.

77.     On August 26, 2024, Fernandes submitted his resignation from his position with iC-1, effective August 30, 2024.

78.     On August 27, 2024, Wilkins, without the approval of iC-1, provided Fernandes access to a folder called "Clients" stored on Plaintiffs' secure file storage platform, SharePoint. The "Clients" folder contains a sub-folder for all Plaintiffs' clients, each of which stores all of the records for each client, including trainings performed and financial information for each contract. It is the essential information needed for Plaintiffs to run their businesses.  Upon information and belief, Fernandes had no valid business reason to need access to this Protected Information three days before his departure from iC-1.  The below image shows Wilkins sharing the "Clients" folder with Fernandes:

15



79.     One day later, on August 28, 2024, Defendant Raptors Edge was formed in the state of Delaware, as show in the image below.



80.   Two weeks later, "Jay Wright" executed Raptors Edge's Application for a Certificate of Registration in Virginia, as show in the excerpt below:

| Entity Name | Entity Type | Printed Name | Signature | Title |
|---|---|---|---|---|
| RAPTORS EDGE SOLUTIONS | Limited Liability Company | Jay Wright | Jay Wright | Member |

81.   At that time, Wright was a former TLG employee, having left the company on December 28, 2022.

82.   After formation, Raptors Edge was registered with the Department of Defense's Commercial and Government Entity Program ("CAGE"), identifying John Wright as the point of contact but using Wilkins's cell phone number, revealing Wilkins's role with the company, as shown in the image below:



83.     Presumably, Wilkins shared the "Clients" folder with Fernandes as part of their scheme to steal Plaintiffs' clients for Raptors Edge.

84.     Fernandes left iC-1 three days after receiving this proprietary information and two days after Raptors Edge's incorporation in Delaware.

**G.     Fernandes's Post-Employment Fraudulent Access to Serpent**

85.     Plaintiffs store Serpent's source code and the configurations needed to execute Serpent on password-protected servers separate from other data (collectively, the "Serpent Servers").

86.     Plaintiffs deploy, and thus execute, Serpent from Serpent Servers.

87.     Training Phones in the field gather and transmit data to Serpent Servers.

88.     Only iC-1 developers working on Serpent have access to Serpent Servers.  That access is restricted to the developers' specific usernames.

89.     When Fernandes submitted his resignation to iC-1, only Fernandes, Hargenrader, Schneider, Gomez, and Privalov had access to Serpent Servers; Wilkins did not have access.

90.     After Fernandes submitted his resignation on August 26, 2024, and concealing that he was conspiring to steal the Protected Information to compete against Plaintiffs, he offered to assist with Serpent for a short time after his departure if the remaining Serpent developers needed his assistance on any issues that might arise with the Platform.

91.     Plaintiffs told Fernandes that they would only reach out to him if there was a significant error affecting Serpent's functionality that the remaining developers were unable to solve after substantial effort.

92.     Serpent ran smoothly, and no issues with the Platform arose from August 30, 2024 through September 19, 2024.

93.     Nevertheless, Plaintiffs have discovered from recently obtained logs from Serpent Servers that Fernandes logged into Serpent Servers on August 30, September 2–6, September 9, September 11–13, and September 19, 2024.   Each day, he accessed Serpent's configurations needed to execute the source code using his username and previously approved IP address.   Each of those days, he had between 140–3,275 data calls, totaling 12,606 data calls in the two-and-a-half-week period.   This is 12,606 rows in the Excel report or over ten thousand pages if printed. The following excerpt is just one of the 12,606 access events showing, among other information, Fernandes's access, the time he accessed the Protected Information, as well as his IP address:

| User name | AWS access key | Event time | Event source | Event name | AWS region | Source IP address | User agent | Error code | Resources | Request ID | Event ID | Read-only | Event type | Recipient Account Id | Event category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| andrew | ASIAXI3EB KJ6YHPBO Q5O | 2024-09-19T22:42:08Z | logs.amaz onaws.co m | Describe MetricFilt ers | us-east-1 | 108.31.18 1.51 | AWS Internal | | [] | a2cd7cef-f54a-4ed0-8f31-627f30a2 ed84 | c49ae369-c242-a2a4-a35e-20a2ba65 7baf | TRUE | AwsApiCa ll | 5.00E+11 | Managem ent |

94.     The excessive volume of access events and the events occurring within seconds of each other indicate that it is unlikely that Fernandes could have accessed the Protected Information manually and instead he likely relied on an automated program to access the Protected Information.

95.     Presumably, Fernandes accessed Serpent Servers through his personal computer. Fernandes had no business-related reason to access the Protected Information.

96.     It appears that Fernandes accessed Serpent Servers after he left iC-1 to obtain the Protected Information he needed to create a product for Raptors Edge that competes with and is derivative of Serpent.

**H.     Wilkins Leaves iC-1**

97.     Wilkins abruptly resigned from iC-1 on October 15, 2024.

98.     Plaintiffs have recently discovered that in the days leading up to his October 15,

2024 resignation, Wilkins used one or more USB thumb drives to save Protected Information from his iC-1 issued laptop (the "iC-1 Laptop").

99.     Based on information that has come to light recently, Wilkins used the USB thumb drives to copy Protected Information, including the majority of the training and financial files needed to run Plaintiffs' businesses and Plaintiffs' client lists, as shown in the below images of certain materials on a drive Wilkins used:







100.    Upon information and belief, Wilkins had no valid business reason to copy Protected Information onto these external drives for Plaintiffs' businesses.

101.    These external drives are not in Plaintiffs' possession, custody, and control.

102.    Also, Plaintiffs have discovered that in the days leading up to his October 15, 2024

resignation, Wilkins told iC-1's IT Department that he wanted to restrict employee access to all Plaintiffs' files on the secure file storage platform, SharePoint.  He instructed IT to create a new SharePoint site called "Swift Training" and to delete the data from the old SharePoint site.  Wilkins claimed that this was necessary so that fewer employees would have access to the files.

103.   Wilkins told Plaintiffs' IT department that he would download all of the relevant files to his desktop from the old SharePoint site and would reupload the files to the new site.

104.   Wilkins never reuploaded approximately 90% of the files to the Swift Training SharePoint site.  The files saved in Plaintiffs' SharePoint account dropped from roughly 13,000 documents to less than 1,000.

105.   The documents that Wilkins never reuploaded to SharePoint constituted almost all of the training and financial files essential to Plaintiffs' businesses.

106.   Plaintiffs believe that Wilkins took this action in an attempt to destroy Plaintiffs' businesses.

107.   Plaintiffs have also recently discovered that at approximately 1:18 PM on Wilkins's final afternoon of iC-1 employment, and through the use of the iC-1 Laptop, Wilkins created a fraudulent invoice for a Serpent training for ███████ personnel set to take place in ███████████ the following week.  In doing so, Wilkins researched the Department of Defense's per diem rates, government business rates for two hotel rooms at the DoubleTree by Hilton Hotel ███████████ ███████████  for October 23–25, 2024, looked up the mileage from Fernandes's home address to the ███████████ hotel, and looked up the IRS mileage rate.  The image below shows Wilkins looking up the mileage and drafting the invoice:



108.    Ultimately, the fraudulent invoice Wilkins prepared for the ████████ training identified lodging, lodging taxes, per diem, mileage, mileage rate, and labor for former employee Fernandes and Wilkins totaling $7,799.02 as evidenced by the image of the invoice below:

| | | ████ Support | | | | |
|---|---|---|---|---|---|---|
| | Lodging | Lodgin Taxes | Per Diem | Mileage | Mileage Rate | Labor |
| Andrew | $219.00 | $70.08 | $87.00 | 310 | $0.67 | ████ |
| Bryce | $219.00 | $70.08 | $87.00 | 0 | 0 | ████ |

109.    As former and soon to be former employees of iC-1, neither Fernandes nor Wilkins were authorized to conduct the ████████ training.

110.    Wilkins had approached Core One about conducting the ████████ training on his own, without iC-1.

111.    Based on the foregoing allegations, Plaintiffs believe that Fernandes would have joined the training had Core One agreed to Wilkins's request.

112.    At approximately 1:36 PM on his final day of iC-1 employment, through the use of the iC-1 Laptop, Wilkins deleted his browsing data from Google Chrome.  This is shown in the image below:



113.    Next, Wilkins searched for his cookies in file explorer and identified dozens of results last modified that same day as evidenced by the image below:



114.    Wilkins then opened the cookies search result in "OLK ebwebview," a folder within the Microsoft Outlook application that uses the Microsoft Edge browser to embed web technologies like HTML and JavaScript into Outlook.  Wilkins tried to recycle the cookies twice, but received an error message each time, as evidenced by the image below:



115.   Wilkins then looked at the security tab of the local drive's properties window and researched utilities in Microsoft Edge.   Upon information and belief, Wilkins continued researching how to delete other content on his iC-1 Laptop.  Seemingly hitting a dead end, Wilkins restarted his computer.

116.   It appears that Wilkins deleted the large volume of files and attempted to delete more to conceal his unlawful actions.

117.   Upon resignation on October 15, 2024, Wilkins left only fourteen files on the iC-1 Laptop, all in his Downloads folder, an apparent oversight.

118.   The remaining files on the iC-1 Laptop included training estimates and a PowerPoint presentation with a September 2024 file name (but October 16, 2024 presentation date) which detailed financials for Plaintiffs' training projects and Serpent.

119.    In his final hours of iC-1 employment, Wilkins viewed numerous Serpent-specific materials, including the above-referenced PowerPoint presentation as evidenced by the chart below:

| File/Path Accessed | Acess Date/Time Stamp |
|---|---|
| C:\Users\BryceWilkins\Downloads\TLG Training Estimate.docx | 10/15/2024 15:30 |
| C:\Users\BryceWilkins\Downloads\2024-09 Swift PMR - Training Technology.pptx | 10/15/2024 15:33 |
| C:\Users\BryceWilkins\Downloads\2024-09 Swift PMR - Training Technology.pptx | 10/15/2024 15:33 |
| C:\Users\BryceWilkins\Downloads\2024-09 Swift PMR - Training Technology.pptx | 10/15/2024 15:36 |
| C:\Users\BryceWilkins\Downloads\TLG Training Estimate.docx | 10/15/2024 15:40 |
| C:\Users\BryceWilkins\Downloads\TLG Training Estimate.docx | 10/15/2024 15:40 |

120.    Upon information and belief, Wilkins was viewing these files to obtain the final information Raptors Edge needed to compete with Plaintiffs. Wilkins did not have a valid business need on behalf of Plaintiffs to view these files.

121.    Less than two hours later, Wilkins sent an email to iC-1's Chief Executive Officer Yost, in which he resigned from his position (the "Resignation Email"). In the Resignation Email, Wilkins complained about his own compensation and mentioned that Fernandes was dissatisfied with his own compensation for two years.

122.    In the Resignation Email, Wilkins denied any knowledge of the circumstances of Fernandes's resignation or future professional plans.

123.    Plaintiffs believe that Wilkins denied any knowledge of the circumstances of Fernandes's departure and future career plans to prevent Plaintiffs from uncovering his conspiracy with Fernandes and others.

124.    In the Resignation Email, Wilkins assured Plaintiffs that he was not off to work for a competitor but was instead "simply going to take some time off and tend to family matters."

**I.    After Stealing It from Plaintiffs, Wilkins and Fernandes Conspire to Sabotage Plaintiffs' Use of Serpent**

125.    Unbeknownst to Plaintiffs, shortly after departing iC-1, Wilkins contacted

Plaintiffs' customer representative and Core One's CEO, Patrick Moniz ("Moniz"), via the Signal messaging platform about the possibility of replacing iC-1 as a subcontractor for the follow-on Serpent training effort.

126.    The October 21, 2024 Signal message Wilkins sent to Moniz contained the following communication:

> Once ▇▇▇ [the then-current Serpent training exercise] is over, roughly 50 [Training] [P]hones will need to be re-provisioned . . . . Before [Core One] returns the [Training] [P]hones to the unit . . . ***Andrew and I need access to them for a few hours to set various triggers to have them start failing.  Simple supply chain attack*** and this is assuming Swift can even re-provision them . . . which is doubtful.

(Emphasis added).

127.    Plaintiffs only recently learned of Wilkins and Fernandes's plot to disable Serpent when Moniz sent Yost a screenshot of Wilkins's Signal message.  The below image shows a copy of the message as provided and the resulting conversation between Moniz and Yost.



128.    In the Signal communication to Moniz, Wilkins indicates clear intent to sabotage the Training Phones being used in the ongoing Serpent training "to have them start failing."

129.    Upon information and belief, the "Andrew" identified as Wilkins's co-conspirator is Defendant Andrew Fernandes.

130.    Wilkins and Fernandes conspired to sabotage the Training Phones in order to undermine iC-1's reputation with ███████, thereby positioning Raptors Edge to successfully win any subcontract stemming from the recompete of the ██████ Contract in summer of 2025.

131.    Plaintiffs remain concerned about the extent to which Wilkins and Fernandes, individually and on behalf of Raptors Edge, continue to conspire to disable Serpent or otherwise compromise Plaintiffs' competitive position and future financial success.

## J.    Defendants Continue Their Scheme to Steal iC-1 and TLG's Customers

132.    Wilkins, Fernandes, Raptors Edge, and Defendants Does 1–10 continue to unlawfully compete with Plaintiffs.

133.    iC-1 recently learned that Wilkins had approached Core One about showcasing a new product to ██████ and Core One at a ██████ exercise in ███████ this month.

134.    According to the Core One employee, Wilkins represented the product as a competitor to Serpent.

135.    Upon information and belief, the only way Wilkins could assemble such a product less than a month after his departure from iC-1 is if it was derivative of Serpent, which was only possible through the theft of the Protected Information, specifically Serpent's source code and integral Serpent configurations stored on the Serpent Servers. Fernandes had informed his colleagues at iC-1 that Serpent was so far ahead of the competition that it would take anyone at least a year to catch up.

136.    Additionally, Swift was recently contacted by the █████████████
("████") about re-conducting training TLG had previously provided to ████ in the past.

137.    The ████ representative wrote, "[t]he purpose of this email is to understand the services that can be offered by Swift for a similar exercise in June 2025, noting there have been some recent structural changes to your organization."

138.    Neither Plaintiffs nor any other Swift entity had communicated with ████ about "structural changes."

139.    Upon information and belief, Defendants contacted ████ offering competing services and representing Plaintiffs as failed companies.

140.    Similarly, prior to Wilkins's departure from iC-1, TLG had been in talks with the ███████ to provide Serpent training to personnel in December of 2024.

141.    Within the last few days, Plaintiffs learned that Wilkins interfered with this customer relationship, improperly solicited the work from Plaintiff TLG's customer, and secretly performed the ██████ training behind Plaintiff TLG's back.

142.    The ██████ training sessions were a follow-on to work TLG performed for the ██████ in December of 2023 and July of 2024 in ██████.

143.    Defendant Wilkins, while he was still employed at iC-1, forecasted in writing to TLG management that TLG would conduct the training in December of 2024, and projected the income to TLG in the fourth quarter of 2024, after which the customer contacted Wilkins for quotes from TLG to complete the work.

144.    Wilkins not only took the business and performed the training in ██████ in December of 2024, he used the same independent contractor who assisted with the TLG training exercise in June of 2024.

145.    Plaintiffs are concerned that Defendants will continue to interfere with Plaintiffs' customers—including recently the ▮▮▮▮▮—using the stolen trade secrets, client data, training materials, and other voluminous files they removed from Plaintiffs around the time of their departure.

146.    Plaintiffs are continuing to uncover Defendants' misconduct.  Based on the totality of the foregoing allegations, it is likely Defendants' efforts to disable Serpent and any other of Plaintiffs' products, theft of Protected Information, solicitation of Plaintiffs' customers, and efforts to compromise Plaintiffs' competitive position and future financial success exceed the allegations herein.

## COUNT ONE
### Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836
### (iC-1 and TLG Against All Defendants)

147.    Plaintiffs incorporate and reallege the paragraphs above as though fully set forth herein.

148.    As a result of their work for iC-1, Defendants Wilkins and Fernandes acquired Protected Information, including the source code and configurations for Serpent, which meets the definition of a trade secret under 18 U.S.C. § 1839(3).

149.    iC-1 and TLG took reasonable steps to protect Serpent by, among other things, keeping its source code and configurations on password-protected servers separate from other data, controlling access to the servers, omitting information about Serpent from company websites, and implementing strong confidentiality policies and related agreements.

150.    Defendants Wilkins and Fernandes accessed and acquired iC-1 and TLG's trade secret information through improper means while working for iC-1 and afterwards.

32

151.    Defendants Wilkins and Fernandes disclosed and used the trade secret information they acquired through improper means, although they were under a duty to maintain the secrecy of that information and to limit its use.

152.    Defendants Wilkins and Fernandes disclosed and used the trade secret information, although it was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit its use.

153.    iC-1 and TLG's trade secrets, including, but not limited to, Serpent's source code and configurations, have actual and potential economic value to iC-1 and TLG and are not generally known or ascertainable to their competitors and are used by iC-1 and TLG in interstate commerce.

154.    Upon information and belief, Defendants Wilkins and Fernandes willfully and maliciously acting on their own and on behalf of Raptors Edge, misappropriated the Serpent source code and configurations, and other trade secrets of iC-1 and TLG.

155.    Plaintiffs are concerned that Defendants will continue to use and disclose iC-1 and TLG's trade secrets to unlawfully compete with Plaintiffs.

156.    Upon information and belief, Defendants Wilkins, Fernandes, and Raptors Edge were working in concert with Defendants Does 1–10 when they took these unlawful actions.

157.    As a result of Defendants' conduct, iC-1 and TLG have suffered, and continue to suffer, harm.

## COUNT TWO
### Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030
### (iC-1 and TLG Against All Defendants)

158.    Plaintiffs incorporate and reallege the paragraphs above as though fully set forth herein.

159.   The Serpent Servers constitute a "protected computer" under 18 U.S.C. § 1030(e) of the Computer Fraud and Abuse Act ("CFAA") as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions" that is used in interstate commerce.

160.   After he left his position with iC-1, Fernandes was not authorized or he exceeded his authority when he intentionally accessed and obtained large quantities of files from Serpent Servers.

161.   Fernandes accessed and obtained the files in Serpent Servers knowingly and with intent to defraud iC-1 and TLG of information of value and obtain a competitive advantage for Raptors Edge.

162.   In doing so, Fernandes caused a loss to iC-1 and TLG of over $5,000 in value in a one-year period.

163.   Defendants Wilkins and Defendants Does 1–10 conspired with Fernandes to carry out these violations of the CFAA for their own benefit and the benefit of Raptors Edge.

164.   Additionally, each Training Phone constitutes a "protected computer" under 18 U.S.C. § 1030(e) of the CFAA as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions" that is used in interstate commerce.

165.   Defendants Wilkins and Fernandes were not authorized to access the Training Phones after their employment with iC-1 terminated.

166.   Wilkins and Fernandes on their own behalf and on behalf of Raptors Edge have been attempting to knowingly, intentionally, and without authorization cause the transmission of

a program, information, code, or command to the Training Phones, and cause damage to the Training Phones after they left their employment with iC-1.

167.    Further, Wilkins and Fernandes on their own behalf and on behalf of Raptors Edge have been intentionally attempting to access the Training Phones without authorization to intentionally and recklessly cause damage and loss in excess of $5,000 to a computer used for an entity of the United States Government in furtherance of national defense and national security. Upon information and belief, Defendants Wilkins and Fernandes were working in concert with Defendants Does 1–10 when they took these unlawful actions.

168.    As a result of Defendants' conduct, iC-1 and TLG have suffered, and will continue to suffer, harm.

## **COUNT THREE**
### **Declaratory Judgment, 28 U.S.C. § 2201, *et seq.***
### **(iC-1 and TLG Against All Defendants)**

169.    Plaintiffs incorporate and reallege the paragraphs above as though fully set forth herein.

170.    There is an actual case and controversy between Plaintiffs and Defendants over the ownership of intellectual property and Defendant Wilkins and Fernandes's duties to iC-1 as former employees.

171.    Defendants misappropriated and/or seek to misappropriate Plaintiffs' trade secret Serpent to create a competitive product derivative of Serpent which they are now marketing to iC-1 and TLG's clients.

172.    Plaintiffs respectfully request that the Court declare that they are the rightful owner of Serpent and that any competitive product created by Defendants derived from Serpent is also their intellectual property.

173.    In addition, Plaintiff iC-1 respectfully requests that the Court declare Wilkins and Fernandes owe a duty of loyalty to iC-1 which prohibits them from using Protected Information obtained during their employment with iC-1 to compete with iC-1 though, *inter alia*, using iC-1's intellectual property and soliciting iC-1's customers.

**COUNT FOUR**
**Violation of the Virginia Computer Crimes Act–Computer Trespass**
**(iC-1 and TLG Against All Defendants)**

174.    Plaintiffs incorporate and reallege the paragraphs above as though fully set forth herein.

175.    Wilkins's iC-1 Laptop and Fernandes's personal computer meet the definition of "Computers" under § 18.2-152.2 of the Virginia Computer Crimes Act ("VCCA") because they are devices that accept "information in digital or similar form and manipulate[] it for a result based on a sequence of instructions."

176.    Plaintiffs' SharePoint contains "Computer Data" as defined under § 18.2-152.2 of the VCCA as "any representation of information, knowledge, facts, concepts, or instructions which is being prepared or has been prepared and is intended to be processed, is being processed, or has been processed in a computer or computer network."

177.    The Serpent Servers contain "Computer Data" as defined under § 18.2-152.2 of the VCCA as "any representation of information, knowledge, facts, concepts, or instructions which is being prepared or has been prepared and is intended to be processed, is being processed, or has been processed in a computer or computer network."

178.    The Serpent Servers store Serpent which constitutes a "Computer Program" under § 18.2-152.2 of the VCCA as "an ordered set of data representing coded instructions or statements that, when executed by a computer, causes the computer to perform one or more computer operations."

179.    The Serpent Servers constitute a "computer network" under § 18.2-152.2 of the VCCA.

180.    Upon information and belief, Wilkins violated § 18.2-152.4(A)(1), (3) and (6) of the VCCA by deleting Computer Data from the iC-1 Laptop, permanently removing and ordering the deletion of data from Plaintiffs' SharePoint, and making unauthorized copies of the data with a USB thumb drive.

181.    Upon information and belief, Fernandes violated § 18.2-152.4(A)(6) of the VCCA by using his personal computer to make unauthorized copies of the Computer Data and the Serpent Computer Program from the Serpent Servers.

182.    Wilkins acted with malicious intent and/or intentionally deceptive means and without authorization when he deleted Computer Data from the iC-1 Laptop and permanently removed data from iC-1/TLG's computer systems and ordered data on those systems deleted.

183.    Fernandes acted with malicious intent and/or intentionally deceptive means and without authorization when he made an unauthorized copy of the Serpent Computer Program.

184.    Wilkins and Fernandes acted with malicious intent and/or through intentionally deceptive means and without authorization when they made unauthorized copies of Computer Data.

185.    Fernandes violated § 18.2-152.3 of the VCCA when he obtained Plaintiffs' property, Serpent, without authority through use of a computer network by acting under false pretenses.

186.    Fernandes acted with malicious intent when he obtained Serpent through false pretenses.

187.    Upon information and belief, Wilkins and Fernandes took these actions on behalf of and for the benefit of Raptors Edge and in concert with Defendants Does 1–10.

188.    As a result of Defendants' conduct, iC-1 and TLG have suffered harm as determined at trial or a pre-trial hearing.

<u>**COUNT FIVE**</u>
**Virginia Uniform Trade Secrets Act**
**(iC-1 and TLG Against all Defendants)**

189.    Plaintiffs incorporate and reallege the paragraphs above as though fully set forth herein.

190.    As a result of their work for iC-1, Defendants Wilkins and Fernandes acquired Protected Information, including upon information and belief the source code and configurations for Serpent, which meet the definition of a trade secret under Va. Code § 59.1-336.

191.    iC-1 and TLG took reasonable steps to protect the Serpent source code and configurations by keeping them on separate servers, controlling access to the servers, omitting information about Serpent from company websites, and implementing strong confidentiality policies and related agreements.

192.    Upon information and belief, Defendants Wilkins and Fernandes acquired iC-1 and TLG's trade secret information through improper means while working for iC-1 and afterwards.

193.    Upon information and belief, Defendants Wilkins and Fernandes disclosed and used the trade secret information they acquired through improper means, though they were under a duty to maintain the secrecy of that information and to limit its use.

194.    Upon information and belief, Defendants Wilkins and Fernandes disclosed and used the trade secret information although it was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit its use.

195.    iC-1 and TLG's trade secrets, including, but not limited to, the Serpent source code and configurations, have actual and potential economic value to iC-1 and TLG and are not generally known or ascertainable to their competitors.

196.    Upon information and belief, Defendants Wilkins and Fernandes willfully and maliciously acting on their own and on behalf of Raptors Edge, misappropriated the Serpent source code and configurations, and other trade secrets of iC-1 and TLG.

197.    Upon information and belief, Defendants Wilkins, Fernandes, and Raptors Edge were working in concert with Defendants Does 1-–10 when they took these unlawful actions.

198.    Upon information and belief, Defendants will continue to use and disclose iC-1 and TLG's trade secrets to compete with Plaintiffs.

199.    As a result of Defendants' conduct, iC-1 and TLG have suffered harm as determined at trial or a pre-trial hearing.

## COUNT SIX
### Breach of the Duty of Loyalty (Virginia Common Law)
### (iC-1 Against Defendants Wilkins and Fernandes)

200.    Plaintiffs incorporate and reallege the paragraphs above as though fully set forth herein.

201.    As employees, Defendants Wilkins and Fernandes owed a common law duty of loyalty to iC-1.

202.    These duties included, but are not limited to, the duty not to misuse, misappropriate, or disclose iC-1's Protected Information, the duty to refrain from competing with iC-1, and the duty to refrain from soliciting iC-1's customers for themselves.

203.    Wilkins and Fernandes violated these duties while still iC-1 employees and afterwards by using the Protected Information they acquired as iC-1 employees.

39

204.   Through their actions described herein, Wilkins and Fernandes have breached their duty of loyalty to iC-1 and have done so with reckless indifference to the consequences and with conscious disregard for iC-1's best interests.

205.   As a result of Wilkins and Fernandes's conduct, iC-1 has suffered harm as determined at trial or a pre-trial hearing.

### COUNT SEVEN
**Breach of Contract (Virginia Common Law)**
**(iC-1 Against Defendant Fernandes)**

206.   Plaintiffs incorporate and reallege the paragraphs above as though fully set forth herein.

207.   The Employment Agreement signed by Defendant Fernandes is a valid, binding, and enforceable contract with iC-1.

208.   Defendant Fernandes has breached numerous provisions of the Employment Agreement, including his obligation to do the following: (1) avoid conflicts of interest while an employee of iC-1 (Section 1(e)); (2) devote his full time and attention to the business affairs of iC-1 while an employee of iC-1 (Section 1(e)); (3) protect iC-1's Confidential Information and not use it for his own benefit while an iC-1 employee (Section 5(c)); (4) avoid misusing iC-1's computer networks and data (Section 6); (5) return all iC-1 property within three days of the termination of his employment (Section 6); (6) not solicit clients, employees, and customers of iC-1 for a one year period following the conclusion of his employment with iC-1 (Section 8) and; (7) his obligation not to compete with iC-1 for a one year period following the termination of his employment (Section 9).

209.   All conditions precedent necessary for the enforcement of the Employment Agreement have been satisfied.

210.    As a result of Defendant Fernandes's conduct, iC-1 has suffered, and will continue to suffer, harm as determined at trial or a pre-trial hearing.

**COUNT EIGHT**
**Violation of the Virginia Business Conspiracy Act**
**(iC-1 and TLG Against All Defendants)**

211.    Plaintiffs incorporate and reallege the paragraphs above as though fully set forth herein.

212.    Defendants Wilkins and Fernandes in combination with each other and Defendants Does 1–10 have conspired against the interests of iC-1 and TLG on behalf of and for the benefit of Raptors Edge and in violation of Va. Code § 18.2-499 through:

(a)    Violating the Virginia Computer Crimes Act;

(b)    Violating the Defend Trade Secrets Act;

(c)    Violating the Virginia Uniform Trade Secrets Act;

(d)    Engaging in tortious interference with Plaintiffs' contracts and business expectancies;

(e)    Breaching their duty of loyalty (specific to iC-1);

(f)    Breaching Defendant Fernandes's Employment Agreement.

213.    Upon information and belief, Defendants' actions were willful and malicious with the express purpose of injuring iC-1 and TLG's businesses in order to enrich themselves.

214.    As a result of Defendants' conduct, iC-1 and TLG have suffered harm as determined at trial or a pre-trial hearing.

**COUNT NINE**
**Conspiracy (Virginia Common Law)**
**(iC-1 and TLG Against all Defendants)**

215.    Plaintiffs incorporate and reallege the paragraphs above as though fully set forth herein.

41

216.    Defendants Wilkins and Fernandes in combination with each other and Defendants Does 1–10 have engaged in common law conspiracy against the interests of iC-1 and TLG for the benefit of Raptors Edge through:

   (a)    Violating the Virginia Computer Crimes Act;

   (b)    Violating the Defend Trade Secrets Act;

   (c)    Violating the Virginia Uniform Trade Secrets Act;

   (d)    Engaging in tortious interference with Plaintiffs' contracts and business expectancies;

   (e)    Breaching their duty of loyalty (specific to iC-1);

   (f)    Breaching Fernandes's Employment Agreement (specific to iC-1).

217.    Upon information and belief, Defendants' actions were willful and malicious with the express purpose of injuring iC-1 and TLG's businesses in order to enrich themselves.

218.    As a result of Defendants' conduct, iC-1 and TLG have suffered harm as determined at trial or a pre-trial hearing.

## COUNT TEN
### Tortious Interference with Contract and Business Expectancies (Virginia Common Law) (iC-1 and TLG Against All Defendants)

219.    Plaintiffs incorporate and reallege the paragraphs above as though fully set forth herein.

220.    iC-1 has enjoyed a business relationship with Core One, of which Defendants Fernandes and Wilkins had intimate knowledge through their close work with Core One on iC-1's behalf for over a year and a half.

221.    TLG has enjoyed close business relationships with ███, the █████████, and the █████████████, of which Defendants Wilkins and Fernandes had knowledge of through

42

their role to project all future sales and revenue for Serpent and through Wilkins's personal relationship with ███ .

222.    Based on the acts of Defendants alleged herein, and upon information and belief, Defendants are tortiously interfering with TLG's business expectancy to provide training for the ███████████ and tortiously interfering with iC-1's contract and business expectancies from Core One, along with iC-1 and TLG's other business expectancies.  Defendants are acting with malice and improper means intending to cause termination of the Core One contract and of those relationships.

223.    Upon information and belief, Defendants have intentionally, maliciously, and without justification acted on their own and on behalf of Raptors Edge to deprive iC-1 and TLG of their existing business relationships by employing wrongful means, including the Protected Information, and otherwise violating their continuing duties to Plaintiffs.

224.    Defendants' conspiracy continues and their ongoing unlawful activities are causing or threaten to cause irreparable harm to iC-1 and TLG.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs iC-1 and TLG, by counsel, respectfully request that this Court enter judgment against Defendants Raptors Edge, Wilkins, Fernandes, and Does 1–10 and grant the following relief:

    a.    Issue a preliminary and permanent injunction that Defendants and any persons or entities acting in concert or participation with them, are:

        i.    Enjoined from deleting or altering any communications and documents obtained or developed during their employment or otherwise acquired from Plaintiffs, including but not limited to the Protected Information;

ii.     Required to immediately task an individual not involved in procurement of government contracts and acceptable to Plaintiffs to preserve and quarantine the Protected Information on all Defendants' devices (including the data, the metadata, e-mails, text messages, voicemails, calendars, cloud data, stored data, and other electronic or hard copy documents that relate in any way to the Protected Information), without reviewing, copying, or transferring the Protected Information. This preservation and quarantine shall include retention of all records, communications, draft and final proposals, draft and final marketing materials, documents mentioning or reflecting communications with any customers and potential customers selling a product to compete with Serpent, as well as all draft and final versions of the design and source code for the product Defendants are attempting to market, and other documents identifying or demonstrating all persons and entities who received or accessed the Protected Information (regardless of their employment status), so that the Protected Information may be permanently deleted in a manner satisfactory to Plaintiffs;

iii.    Enjoined from designing, coding, selling, distributing, disclosing, using, marketing, or otherwise generating revenue from any product designed with the Protected Information or otherwise derived from Serpent and/or Defendants' knowledge of Serpent source code;

iv.     Enjoined from directly or indirectly soliciting or otherwise contacting the Swift Entities' customers and current employees;

v.      Enjoined from directly or indirectly contacting the Swift Entities' former

44

employees and communicating with third parties (including the government and third parties) about Serpent or a product contemplated by subpart (c) above;

vi.   Enjoined from directly or indirectly disclosing, disseminating, or using for their own purpose, or any other purpose, the Protected Information, including, but not limited to, the source code for Serpent and the Swift Entities' customer lists and data;

vii.   Enjoined from directly or indirectly using the Protected Information in response to any solicitation or business opportunity;

viii.   Enjoined from directly or indirectly interfering with the Swift Entities' existing contracts and taking any action, activity or course of conduct that is substantially detrimental to the business reputation and goodwill of the Swift Entities;

ix.   Enjoined from deleting, destroying, sabotaging, disabling, or otherwise harming or altering any of the Swift Entities' computer systems, products, and other technology, including but not limited to Serpent;

x.   Required within one (1) calendar day after the Court enters its order to (1) inform in writing any persons or entities in active concert or participation with Defendants that they must immediately cease engagement in all the above activities described in subparts (i)–(ix), and (2) provide a copy of such communications to Plaintiffs' counsel.

xi.   Enjoined from breaching or conspiring to breach Fernandes's iC-1 employment agreement;

xii.      Required within five (5) calendar days after the Court enters its order to submit to Plaintiffs' counsel all hard copy documents and communications (including, but not limited to, texts, e-mails, Signal messages, and other forms of communication) within their possession, custody, or control that relate in any way to the Protected Information;

xiii.      Required within five (5) calendar days after the Court enters its order to each sign and return to Plaintiffs' counsel a declaration signed under penalty of perjury that they will not recreate or utilize any Protected Information or any electronic device containing the Protected Information, currently used to store the Protected Information, or previously used to access the Protected Information.

xiv.      Required within five (5) calendar days after the Court enters its order to submit to at their own cost to forensic examinations with a mutually agreeable vendor of all devices in their possession, custody, or control, including but not limited to personal and Raptors Edge laptops, tablets, and phones, containing Protected Information or used to store Protected Information to allow Plaintiffs to determine the scope and extent of the Protected Information on the devices and whether and how Defendants accessed, used, and otherwise distributed such Protected Information. A report showing the vendor's findings, which should not contain the content of the Protected Information, shall be simultaneously provided to the counsel for the Parties; and

xv.     Required to file a verification with the Court within ten (10) calendar days after the Court enters its order that Defendants have fully complied with the order.

b.      To the extent not irreparable, compensatory damages, including but not limited to, costs incurred conducting electronic forensic analyses of iC-1 and TLG's hardware and software to determine the extent of Defendants' wrongful acts and ensure the security of Serpent and other Protected Information;

c.      Disgorgement of Defendant Wilkins and Fernandes's salary, bonuses, and other forms of compensation and business expense reimbursements from iC-1 for the periods of time after they began the improper acts in an amount to be determined at trial or a pre-trial hearing;

d.      Treble damages in an amount to be determined at trial or a pre-trial hearing;

e.      Punitive damages in an amount to be determined at trial or a pre-trial hearing;

f.      Costs and disbursements of this action, including reasonable attorney's fees; and
        Such other relief as this Court deems appropriate.

January 16, 2025                       IC-1 SOLUTIONS, LLC AND TLG WORLDWIDE, LLC
                                       By counsel


                                       By:    */s/ Attison L. Barnes, III*
                                              Attison L. Barnes, III (VA Bar No. 30458)
                                              Savanna L. Shuntich (VA Bar No. 89568)
                                              Michelle B. Karavas (*pro hac vice forthcoming*)
                                              Wiley Rein LLP
                                              2050 M Street NW
                                              Washington, DC 20036
                                              Tel: (202) 719-7000
                                              Fax: (202) 719-7049
                                              abarnes@wiley.law
                                              sshuntich@wiley.law

mkaravas@wiley.law
*Counsel for Plaintiffs iC-1 Solutions, LLC and*
*TLG Worldwide, LLC*